**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

JEROME H. FRIEDMAN, JR.,

Plaintiff,

v. CIVIL ACTION NO. 2:23-cv-00075

JACOB MASSILE,

Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Deputy Jacob Massile's Motion for Summary Judgment [ECF 32], filed September 26, 2025. The matter is ready for adjudication.

**I.**

Plaintiff Jerome H. Friedman Jr.'s verified complaint [ECF 1], filed February 1, 2023, alleges that Defendant Jacob Massile, who was then a Fayette County Deputy Sheriff, used excessive force against Mr. Friedman during his arrest on August 3, 2021, in Fayetteville. [ECF 1 at 4-6, 8-9]. Deputy Massile answered the complaint [ECF 20] and, following an unused, nearly six-month period for discovery, he moved for summary judgment. Mr. Friedman received multiple notices pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). [ECF 23 at 2; ECF 34 at 1-2; ECF 41 at 3]. He filed two documents with exhibits in response [ECF 37, 38]. He had previously filed other documentation, including a lengthy sworn statement with attachments such as medical records and other personal information that were sealed. [ECF 30]. Deputy Massile replied on October 31, 2025. [ECF No. 40]. It is **ORDERED** that ECF document 30 and its attachments be, and they hereby are, unsealed. The Clerk is directed to forthwith furnish a copy of the unsealed documents to Deputy Massile.

**II.**

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp*., 12 F.3d 1310, 1316 (4th Cir. 1993)). The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); V*ariety Stores, Inc. v. Wal-Mart Stores, Inc*., 888 F.3d 651, 659 (4th Cir. 2018)."The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the Courts,* 780 F.3d 562, 569 (4th Cir. 2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

**III.**

***A. Excessive Force Claim***

**1. Facts Arising from the Arrest, Taken Most Favorably to Mr. Friedman**

On August 3, 2021, Mr. Friedman was traveling southbound in an allegedly stolen vehicle on U.S. Route 19 when Deputy Massile attempted to pull him over for speeding and

reckless driving. [ECF 1 at 4]. Mr. Friedman contends he was "having a family crisis[,]" and, after pulling over at a gas station, he "got out [of the car] in panic [and fear], and frantically ran." [*Id.*] Mr. Friedman further contends that, once he got about 20 feet from his vehicle, he placed his hands on his head and knelt down, saying "I surrender." [*Id.*] He denies that a scuffle at his instance ensued or that he was ever on top of Deputy Massile and attempting to unholster Deputy Massile's firearm. [ECF 30 at 1, 3 and 5 ("I never once attacked Mr. Massile . . . ." and characterizing the alleged reach for Deputy Massile's firearm as "100% UNTRUE")].

He further claims that, despite his attempted surrender, Deputy Massile "beat and choke[d] [him] from behind (almost unconscious)" and stabbed him in the back with a knife. [ECF 1 at 4]. Mr. Friedman further asserts that he "broke free from the sleeper/illegal hold and retreated away in fear for [his] life." [*Id.*; ECF 30 at 6]. He further asserts that, when he was about 10 yards away, Deputy Massile pulled out a handgun and "fired 15 hollow tip/lethal bullets into Mr. Friedman's back ([and] neck), striking [Mr. Friedman] four times[.]" [ECF 1 at 5; ECF 30 at 6 (stating Deputy Massile "Empties the entire clip of hybrid/lethal hollow point ammo into my unarmed backside, while I am . . . running with my hands in the air . . . yelling 'Help - Help!!'")].

Mr. Friedman further asserts that he fell to the ground, unarmed, wounded, and bleeding, and Deputy Massile came up and held his gun to Mr. Friedman's head screaming "I'll blow your brains out!" while a police dog bit him. [ECF 1 at 5; ECF 30 at 7-8]. He contends he could hear Deputy Massile's now-spent firearm clicking at his head (which was singed by the hot barrel) as Deputy Massile continued to attempt to fire his weapon. [ECF 30 at 8].[1] Mr. Friedman

[1] The August 3, 2021, police report reflects that four unfired rounds remained in a magazine collected with Deputy Massile's firearm. [ECF 38 at 6]. Mr. Friedman's account may thus be mistaken or deceptive as to the clicking sound he heard. That comment, however, is wound up in the many factual conflicts that, at this point, the Court is precluded from resolving.

contends that, due to his injuries, he had pieces of his bladder and intestines removed, is "now disfigured for life," and still has a bullet lodged in his L-4 spine and suffers from partial paralysis. [ECF 1 at 5; ECF 37 at 1].

Mr. Friedman asserts that the posterior location of his stab and bullet wounds supports a finding that he was "retreating for his safety" at the time he was wounded, and he further contends that Deputy Massile could have -- and did not -- use less lethal forms of force, such as a Taser™ or mace. [ECF 30 at 2]. He further contends that he never attacked Deputy Massile and did not, as Deputy Massile asserts, reach for Deputy Massile's gun holster. [*Id.* at 3]. He notes Deputy Massile had no injuries and indicated to other officers that he was "fine" after the incident. [*Id.*] Mr. Friedman further asserts that Deputy Massile was a "rookie officer" who was not authorized to conduct highway patrol, has had three other excessive force cases, and has a "habit" of "hiding body camera footage." [ECF 37 at 1]. Mr. Friedman offers no other evidence than his own statements to support these contentions. Additionally, though not relevant presently, Deputy Massile sharply disagrees with Mr. Friedman's version of events.

**2. Bodycam Evidence**

Deputy Massile provided his body camera footage. [ECF 35]. The footage begins at or around 2:38:14 on August 3, 2021. For much of the encounter, the body cam is lying on the ground near the scene. Nevertheless, the Court has undertaken a minute-by-minute review of the video footage and its audio. It is often the hope of a reviewing court that objective evidence such as camera footage will clarify or resolve a disputed chain of events. That is not the case at present. The body camera footage fails to conclusively verify either party's factual assertions, and the Court cannot confirm the speakers and sounds solely from the audio evidence. Additionally, Mr.

Friedman's filings repeatedly suggest that the video footage provided by Deputy Massile is not the complete footage from Deputy Massile's body camera and that there are "other versions" that were included in his criminal discovery materials that would show his "surrender" before being shot and how Deputy Massile acted after the shooting. [ECF 30 at 3; ECF 37 at 2, 4; ECF 38 at 1].

Mr. Friedman's filings contend that the full video footage (which he neither sought nor secured) would demonstrate a number of elements that would confirm his version of events.[2] For example, he states the balance of the footage would demonstrate that when he was on his knees attempting to surrender, Deputy Massile approached with his gun unholstered "ready to shoot [Mr. Friedman]." [ECF 30 at 3]. Mr. Friedman asserts that Deputy Massile re-holstered the gun, but then "close fist punch[ed]" Mr. Friedman, causing him to put his hands over his face. [*Id.* at 3-4].

**3. Post-Arrest Events**

Mr. Friedman was indicted in the Circuit Court of Fayette County on several criminal offenses stemming from his conduct on August 3, 2021. On September 2, 2022, he pled guilty, pursuant to *Kennedy v. Frazier*, 178 W. Va. 10, 357 S.E.2d 43 (1987). In a *Kennedy* Plea setting, a defendant may plead guilty to a crime "even though he is unwilling to admit participation in the crime, if he intelligently concludes that his interests require a guilty plea and the record supports the conclusion that a jury could convict him." *Id.*, Syl. Pt. 1 at 10, 357 S.E.2d at 43. Mr.

[2] In the interests of a complete evidentiary record, counsel for Deputy Massile is **ORDERED**, on or before September 29, 2026, to furnish the Court and Mr. Friedman (at his current place of incarnation) with a copy of the complete video footage from any and all bodycams that recorded the subject events. Counsel is directed to inform Mr. Friedman's custodian that, in accordance with the Court's direction, Mr. Friedman and staff at his facility arrange for a time to watch the subject footage. It is further **ORDERED** that such video evidence shall thereafter be stored with Mr. Friedman's personal property in the state shop or otherwise maintained by the prison so that Mr. Friedman may have access to the same for the duration of this civil action and any potential appeal therefrom.

Friedman's plea order specifically indicates that he entered the plea "in an effort to avoid the possibility of a significantly higher penalty" and that he "consents to being found guilty of the felony offenses . . . even though he is unwilling to admit participation in the offenses alleged." [ECF 32-4 at 6].

The written plea agreement which resulted in the *Kennedy* Plea reflects the subject offenses as (1) possession of a stolen vehicle (Count One), (2) unlawful assault on a police officer (lesser included offense of Count Three), and (3) attempting to disarm a law enforcement officer (Count Four). [ECF 32-4]. The circuit court found that "[a] factual basis exists for entry of the guilty pleas, *based on the State's proffer*." [*Id.* at 6 (emphasis added)]. The circuit court found that Mr. Friedman's guilty pleas were knowing and voluntary. [*Id.* at 5].

Deputy Massile's reply asserts that Mr. Friedman's "bare assertion that he 'surrendered' does not create a triable dispute, and it conflicts with his criminal judgment and the sworn testimony and records provided" by him. [ECF 40 at 4-5]. The reply largely questions Mr. Friedman's credibility, which may not be weighed at this stage of the proceedings. [*Id.* at 2-3]. Deputy Massile maintains that "the only person in the body camera footage who can be heard yelling for help was [Deputy Massile]." [*Id.* at 3]. He further contends that the undisputed evidence demonstrates that the force he used was "justified under the circumstances as Plaintiff posed an immediate threat to [his] safety." [*Id.* at 5].

**4. Governing Standard**

A Fourth Amendment excessive force claim arising from an arrest or investigatory stop hinges upon the force employed. The force used is judged by its "objective reasonableness[,]" paying "careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (*citing Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004); *Garner*, 471 U.S. at 11. Inasmuch as "deadly force is extraordinarily intrusive, it takes a lot for it to be reasonable." *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019), *citing Garner*, 471 U.S. at 9.

In *Barnes v. Felix*, 605 U.S. 73, 80 (2025), the High Court noted "earlier facts and circumstances [preceding a shooting] may bear on how a reasonable officer would have understood and responded to later ones." *Id.* One must consider the "'full context, with an eye toward the proportionality of the force in light of all the circumstances.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015). The Court assesses "what the police officer reasonably perceived at the time that he acted and whether a reasonable officer armed with the same information, would have had the same perception and have acted in like fashion." *Lee v. City of Richmond*, 100 F. Supp. 3d 528, 541 (E.D. Va. 2015). Deputy Massile asserts his conduct was objectively reasonable.

**5. Analysis**

Treating all evidence and reasonable inferences in the light most favorable to Mr. Friedman, (1) he was lawfully stopped by Deputy Massile while driving recklessly and dangerously in a suspected stolen vehicle, (2) he was unarmed, (3) he fled from his vehicle, (4) he knelt a short time later to surrender, placing his hands on his head, (5) Deputy Massile approached with a handgun drawn, re-holstered the gun, but then "close fist punch[ed]" Mr. Friedman, causing

him to put his hands over his face, (6) Deputy Massile then stabbed Mr. Friedman in the back with a knife and "beat and chok[ed] [him] from behind (almost unconscious)," (7) Mr. Friedman "broke free from the sleeper/illegal hold and retreated away in fear for [his] life," (8) while he was fleeing and about 10 yards away, Deputy Massile pulled out his handgun and "fired 15 hollow tip/lethal bullets into Mr. Friedman's back ([and] neck), striking [him] four times[,]" (9) Mr. Friedman fell to the ground, unarmed, wounded, and bleeding, (10) Deputy Massile held his gun to Mr. Friedman's head, screaming "I'll blow your brains out![,]" while repeatedly pulling the trigger on the firearm that had spent its ammunition and singeing Mr. Friedman's head with the barrel, and (11) a police dog bit Mr. Friedman during this time.

Considering the totality of the circumstances -- and the evidence of record from the required, plaintiff-centered perspective -- the initial stop involved reckless driving in a suspected stolen vehicle. Mr. Friedman indeed fled for a brief time but then knelt with his hands on his head. The severity of the underlying offenses, reckless driving, auto theft, and fleeing, did not justify the severity of force thereafter used. That portion of the events -- at the very least -- that involved Mr. Friedman's surrender followed by Deputy Massile stabbing him in the back, beating and choking him to near unconsciousness, and later firing nearly or more than a dozen rounds as Mr. Friedman retreated roughly ten yards in fear of his life, would constitute a grossly disproportionate and objectively unreasonable use of force. Even if flight constitutes resistance, deadly force is permissible only where a suspect poses a serious, immediate threat, which Mr. Friedman's evidence does not support. After Mr. Friedman lay wounded and unarmed, the continued threats to kill him, pulling the trigger repeatedly on the firearm, pressing the firearm barrel to his head, and the deployment of a police dog suggest the absence of a legitimate law-enforcement justification.

Under the totality of the circumstances, judged from the perspective of a reasonable officer on the scene, and not with hindsight, the alleged sequence of escalating, repeated, and extreme applications of force lacks any reasonable relationship to the governmental interests at stake and would therefore constitute a Fourth Amendment unreasonable seizure actionable under the § 1983 remedy.

Again, Deputy Massile vigorously disputes Mr. Friedman's account, with a detailed and granular timeline of events of his own. There are thus genuine issues of material fact respecting the events of August 3, 2021. Summary judgment on the Fourth Amendment claim is thus inappropriate.

### *B. Qualified Immunity Defense*

Deputy Massile also contends that he is entitled to qualified immunity on Mr. Friedman's Fourth Amendment claim.

#### 1. Governing Standard

The doctrine of qualified immunity protects government officials, sued in their individual capacities, from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Viewing the facts in the light most favorable to Mr. Friedman, the Court must decide (1) whether there was a constitutional violation, and (2) whether the right violated was clearly established at the time of the violation. *Id.* at 232. The Court may address either prong first. *King v. Riley*, 76 F.4th 259, 265 (4th Cir. 2023) (citing *Pearson*, 555 U.S. at 236). Whether a right is clearly established is a question of law, while a genuine question of material fact regarding whether and how the conduct occurred "must be reserved for trial." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992) (citing *Mitchell v. Forsyth*, 472 U.S.

511, 526 (1985)). A right is clearly established if "every 'reasonable official would [understand] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

As noted by Deputy Massile, "[q]ualified immunity exists to protect officers in the performance of their duties unless they are 'plainly incompetent' or they 'knowingly violate the law.'" *Doe v. Broderick*, 225 F.3d 440, 446 (4th Cir. 2000). [ECF 33 at 7]. It protects officers exercising their official duties from the risk of personal liability for making "bad guesses in gray areas" and ensures that they are only responsible for "transgressing bright lines." [*Id.*, quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)].

**2. Analysis**

Based upon Mr. Friedman's version of the events recounted in detail earlier, especially regarding the use of deadly force to apprehend a fleeing individual who engaged in reckless driving and possibly vehicle theft, qualified immunity is unavailable. An observation by our Court of Appeals just a few months ago -- in a case that involved a fleeing suspect who possessed a weapon no less -- is worth quoting at length:

> Here, the question is whether it was clearly established in April 2020 that an officer would violate the Fourth Amendment by using deadly force against an *armed suspect* who runs from an officer, ignores police commands, crouches momentarily before running again, then turns his head to look behind him as he's running, but doesn't raise his weapon or make any other threatening movements. As in *Knibbs*, "[w]e recognize that neither the Supreme Court nor this Circuit has considered a qualified immunity case with a fact pattern precisely identical to the instant one." 30 F.4th at 223. "[B]ut that does not preclude a finding that the right was clearly established." *Id.*
>
> Since our 2013 decision in *Cooper v. Sheehan*, we've repeatedly warned officers that it's not objectively reasonable to use deadly force against an armed suspect unless "based on a reasonable assessment, the officer or another person *is threatened with the weapon*." 735 F.3d at 159. So when Davis shot and killed J.R.

> in April 2020, it was "clearly establish[ed] that the failure to obey commands by a person *in possession of . . . a weapon* only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon." *Knibbs*, 30 F.4th at 225 (citing several pre-2020 cases).
>
> Again, there's no undisputed evidence that J.R. threatened Davis with his weapon or otherwise. Absent such evidence, Davis violated J.R.'s clearly established "right to be free from deadly force when posing no threat." *Sheehan*, 735 F.3d at 160.

*Ruffin v. Davis*, 174 F.4th 414, 420 (4th Cir. 2026) (emphasis added).

The decision in *Ruffin* is all-the-more material inasmuch as it is undisputed Mr. Friedman lacked a weapon and was fleeing -- then unambiguously surrendered -- after committing a clearly unlawful and dangerous -- but non-violent -- offense. Lest one doubt that common-sense observation, it has the force of law:

> As we explained in *Henry*, "[a] police officer who shoots a fleeing suspect without probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others violates that suspect's Fourth Amendment rights." *See* 652 F.3d at 532 (citation modified). Similarly, in *Garner*, the Supreme Court recognized that "shooting nondangerous fleeing suspects is [not] so vital as to outweigh the suspect's interest in his own life." *See* 471 U.S. at 11, 105 S. Ct. 1694. The *Garner* Court elaborated:
>
> > [T]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. However, where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.
>
> *See* 471 U.S. at 11, 105 S. Ct. 1694 (citation modified).

*Cooper v. Doyle*, 163 F.4th 64, 81 (4th Cir. 2025).

Simply put, the use of deadly force -- judged purely by Mr. Friedman's version of events -- would contravene clearly established law. In sum, again, there are genuinely disputed, material issues of fact. Accordingly, Deputy Massile is not entitled to summary judgment on his qualified immunity affirmative defense.

**C. Application of *Heck v. Humphrey*.**

Based on Mr. Friedman's *Kennedy* Plea in the circuit court, Deputy Massile asserts the Fourth Amendment claim is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck,* the Supreme Court concluded a § 1983 claim is not cognizable if it implies the invalidity of the plaintiff's underlying criminal conviction. Specifically, the *Heck* Court held that:

> [I]n order to recover damages for allegedly unconstitutional . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus . . . . A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* at 486-87. Deputy Massile asserts that this bar applies to excessive force claims, "if the alleged use of force occurred at the time the offense of resisting arrest or assaulting an officer was being committed." *Riddick v. Lott*, 202 F. App'x 615, 616 (4th Cir. 2006) (unpublished). [ECF 33 at 13]. He further contends that a § 1983 excessive force claim would not imply the invalidity of a conviction "only when there is 'no legal nexus between the officer's alleged punch [or other use of force] and [the plaintiff's] resistance and assault,' i.e., [where] the alleged use of force occurs independently of a plaintiff's conduct." [*Id.*] In the case of a conventional guilty plea, Deputy Massile's observations to this point are quite well-taken.

Deputy Massile then asserts that to succeed on his excessive force claim, "Plaintiff would necessarily have to prove that he did not engage in the actions for which he pleaded guilty – that is, he would have to prove that he did not commit assault on a police officer and attempt to disarm a law enforcement officer on August 3, 2021." [*Id.* at 13-14]. Deputy Massile further contends that "Plaintiff has conceded that he "unlawfully but not maliciously . . . wound[ed] or by any means cause[d] . . . [a] law-enforcement officer acting in his or her official capacity bodily injury with intent to maim, disfigure, disable or kill him'" and "knew that such officer was acting in his official capacity," as required by *West Virginia Code* section 61-2-10b(c), to support a conviction for unlawful assault on a police officer. [*Id.* at 14]. And, by pleading guilty to the felony offense of attempting to disarm a law enforcement officer, Deputy Massile asserts that Mr. Friedman has conceded that he "intentionally" "attempt[ed] to disarm a law-enforcement officer . . . acting in his or her official capacity," as required by *West Virginia Code* section 61-5-17(b). Deputy Massile maintains that Mr. Friedman's excessive force allegations are "wholly inconsistent with the underlying criminal convictions to which he pleaded guilty" and that the facts supporting both are "inextricably intertwined." *See Cummings v. City of Akron*, 418 F.3d 676, 682-83 (6th Cir. 2005). [ECF 33 at 15]. Deputy Massile asserts that Mr. Friedman's excessive force claim is barred under *Heck* because Mr. Friedman's underlying convictions have not otherwise been invalidated. [*Id.*] This is where Deputy Massile's assertions run aground.

Unquestionably, the circuit court found that there was a factual basis for the guilty pleas based on the State's damning proffer, as follows:

> MR. TONEY: Yes, Your Honor. Your Honor, if testimony was elicited and evidence presented the evidence would show that on or about August the 3rd, 2021, the Defendant was driving a vehicle that had been entered into the NCIC system as stolen from Braxton County. A citizen had called the 911 Center and advised that this vehicle was traveling at an alarming rate of speed and that Officer Massile received the be on the lookout, the BOLO for the vehicle. He exited Sheet[z] and

> took up a position at the interaction [sic; intersection] of Maple Lane and Route 19.
>
> That the Defendant drove past Officer Massile. Officer Massile identified the vehicle. He pulled out behind the vehicle, activated his emergency lights and sirens, and attempted to initiate a traffic stop. The Defendant failed to comply with the officer's vehicular commands of stopping with the emergency lights and sirens and exited right at the stop light near Sheet[z] in Fayetteville, West Virginia.
>
> The evidence would show that the Defendant in lieu of traversing the roadway drove through the grass, through the Sheet[z] parking lot, to the back of the Sheet[z] store location, and off to the side. The evidence would show that Deputy Massile pursued the Defendant but upon catching up to the vehicle he discovered the vehicle unoccupied and located the Defendant in a brush area behind the store. The evidence would show that Deputy Massile issued a number of verbal commands that the Defendant failed to comply with. The evidence would show that Officer Massile attempted to arrest the Defendant, and the Defendant resisted the arrest, and entered into a struggle and altercation with Officer Massile.
>
> The evidence would show that the Defendant was able to be in the dominant position on top of Officer Massile and began reaching for his firearm. The evidence would show that Deputy Massile took active steps in order to pin the firearm between his body and the ground in an effort to keep that duty gun out of the Defendant's possession and control. The evidence would show that Officer Massile received numerous injuries from rocks, brush, debris, etcetera, during this altercation, Your Honor, and the evidence would show that while the Defendant was ultimately unsuccessful in disarming Officer Massile, that through a long duration struggle he continued reaching and advancing and attempting to pull Officer Massile's duty gun from his person.
>
> Judge, the evidence would show that all of this occurred in Fayette County on the early morning of August 3rd, 2021. It would show that the officers in identifying the vehicle and running the registration, identified the vehicle as the same vehicle that had been entered in the NCIC system as stolen, and the evidence would show that the duty gun was operable as Officer Massile fired a number of rounds in defense of his person once he was able to safely draw the weapon and neutralize the Defendant's advances.

[ECF 40-1 at 30-33].

The prosecution theory is one thing. Mr. Friedman's actual plea is another. Mr. Friedman did not specifically admit any conduct that formed the basis of his convictions. That is the nature of a *Kennedy* Plea. Again, in a *Kennedy* Plea setting, a defendant may plead guilty to a crime "even though he is unwilling to admit participation in the crime, if he intelligently concludes

*that his interests require a guilty plea* and the record supports the conclusion that a jury *could* convict him." *Id.*, Syl. Pt. 1 at 10, 357 S.E.2d at 43 (emphasis added). Furthermore, Mr. Friedman's plea order specifically indicates that he entered the plea "in an effort to avoid the possibility of a significantly higher penalty" and that he "consents to being found guilty of the felony offenses . . . *even though he is unwilling to admit participation in the offenses alleged*." [ECF 32-4 at 6 (emphasis added)].

Given Mr. Friedman's *Kennedy* Plea and the surrounding circumstances discussed immediately above, the Court concludes Deputy Massile has not met his burden to demonstrate that success on Mr. Friedman's Fourth Amendment excessive force claim would necessarily imply the invalidity of his state criminal convictions so as to be barred by *Heck*. Accordingly, Deputy Massile is not presently entitled to judgment as a matter of law on that issue.

## IV.

For the reasons stated herein, the Court concludes there are genuine issues of material fact, and Deputy Massile is not entitled to judgment as a matter of law on Mr. Friedman's Fourth Amendment unreasonable seizure claim or his affirmative defenses based on *Heck* or qualified immunity. Consequently, it is hereby **ORDERED** that Deputy Massile's Motion for Summary Judgment [ECF 32] is **DENIED**.

Deputy Massile is directed to notify the Court on or before September 29, 2026, whether he intends to notice an interlocutory appeal of the qualified immunity ruling. It is further **ORDERED** that the Criminal Justice Act Attorney Advisor Meagan McClure begin the process of locating counsel to represent Mr. Friedman. Pending the outcome of that process -- which may consume significant time -- this case is **STAYED** and **RETIRED TO THE INACTIVE**

**DOCKET** pending the further order of the Court.

Finally, counsel for Deputy Massile is **ORDERED**, no later than October 1, 2026, to reflect on the docket compliance with the bodycam/video footage turnover order earlier mentioned in this written opinion and order.

The Clerk is directed to send a copy of this written opinion and order to Ms. McClure, counsel of record, and any unrepresented parties.

ENTER: September 15, 2026

Frank W. Volk
Chief United States District Judge